**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

TYLER J. CARROW,

                                Plaintiff,

        v.                                                          8:17-cv-91
                                                                    (TJM/DJS)

THE STATE UNIVERSITY OF NEW YORK
AT POTSDAM, WALTER J. CONLEY, TOBY
J. WHITE, STEVEN J. MARQUSEE, and
ALAN L. HERSKER,

                                Defendants.


_____

**Thomas J. McAvoy, Sr. U.S.D.J.**


### DECISION & ORDER

        Before the Court is Defendants' motion to dismiss certain claims in this case arising

out of Plaintiff's schooling at Defendant State University of New York at Potsdam ("SUNY-

Potsdam"). See dkt. # 39.  The parties have briefed the issues and the Court has

determined to decide the matter without oral argument.

## I.    BACKGROUND

        Plaintiff filed the instant action _pro se_ in the Supreme Court of St. Lawrence

County, New York.  See Notice of Removal, dkt. # 1.  Defendants filed a notice of removal

in this Court on January 25, 2017.  Id.  On February 21, 2017, Defendants filed an answer

to the Complaint.  See dkt. # 5.   The parties then engaged in discovery, relying on

Magistrate Judge Daniel J. Stewart to resolve several disputes concerning the production

1

of documents.  Judge Stewart established a uniform pre-trial scheduling order.  See dkt. #

12.  On September 12, 2017, Judge Stewart held a telephonic discovery conference and

extended the dispositive motion deadline to March 13, 2018.  Id.  On January 10, 2018,

the Defendants filed the instant motion to dismiss, citing to Federal Rule of Civil Procedure

12(c).  See dkt. # 39.

The Complaint concerns matters that occurred during the second half of 2015,

while Plaintiff was enrolled as a student at SUNY-Potsdam.  At that time, Plaintiff was a

senior studying biology.  Complt., dkt. # 1, at ¶ 7.  By March 2015 he had completed all of

the requirements for his undergraduate degree, save a language proficiency.  Id.  At that

time, he began the process required to establish an internship through the University.  Id.

Defendant Toby J. White, SUNY-Potsdam's Internship Coordinator, was charged with

approving internship proposals.  Id. at ¶ 8.  Plaintiff alleges that SUNY-Potsdam approved

an internship for him at Claxton-Hepurn Medical Center Emergency Department in

Ogdensburg, New York.  Id. at ¶ 9-10.  Plaintiff alleges that he agreed to pay $3,032 to

SUNY-Potsdam to participate in the internship, and that Defendants Walter J. Conley and

Toby White had approved his proposal.  Id. at ¶ 11.

Plaintiff also completed and signed a "Learning Agreement Form," which Defendant

Conley, another faculty sponsor, the Department Chair, and the supervisor at the

internship site, Julie Sciorra, also signed.  Id. at ¶ 13.  These signatures, Plaintiff

contends, completed the approval process for the internship.  Id. at ¶ 15.  The document

was complete on May 4, 2015.  Id.  Plaintiff alleges that, "once signed," the "Learning

Agreement Forum" became a "binding legal contract."  Id. at ¶ 16.  The internship at the

Claxton-Hepburn Medical Center Emergency Department was scheduled to last between

2

May 27, 2015 and August 11, 2015.  Id. at ¶ 17.   Plaintiff alleges that Defendant White

failed to comply with a requirement that mid-term and final evaluations be sent to Plaintiff

before he arrived at the internship site.  Id. at ¶ 18.

Plaintiff commenced his internship on May 27, 2015.  Id. at ¶ 19.  Plaintiff alleges

that Defendant Conley failed to provide a syllabus for the internship that offered "a fair and

accurate description of the internship requirements."  Id. at ¶ 20.  Conley also failed to

deposit the syllabus in the office of the appropriate Dean, and did not make contact with

Sciorra, Plaintiff's site supervisor.  Id. at ¶¶ 21-22.  Indeed, Plaintiff claims, "Conley . . .

followed none of the advised policies and procedures" set forth "by both the State

University of New York Faculty Senate on Internships and Co-ops and . . . the State

University of New York at Potsdam."  Id. at ¶ 24.  Plaintiff contends that these failings left

Conley with "NO basis to give the Plaintiff . . . a grade of less than a 4.0."  Id. at ¶ 25.  A

student cannot receive a grade, Plaintiff contends, without the required syllabus.  Id.

Since Conley "knowingly neglected these policies and requirements" Conely "surrenders

his ability to grade this internship as anything less than the highest possible numerical

grade as stipulated by the legal contract."  Id. at ¶ 26.  Moreover, Plaintiff claims, Conley

failed to "create a grading rubric for the assigned research paper . . . and oral

presentation."  Id. at ¶ 28.  As such, Conley assigned a grade "on the basis of arbitrary

and illegal standards."  Id.

Plaintiff also alleges that SUNY-Potsdam officials failed to sign documents affecting

his internship.  On June 4, 2015, Plaintiff sought an "affiliation agreement" from SUNY-

Potsdam, which would allow him to "shadow doctors outside of the assigned emergency

department."  Id. at ¶ 29.  Plaintiff obtained a signature on the agreement from Defendant

3

White, but was advised by the Medical Center on June 15, 2015 that the signature on the affiliation agreement from his site supervisor, Sciorra, was insufficient. Id. at ¶¶ 30-31. Plaintiff needed the signature of the "head of administration." Id. at ¶ 31. On July 15, 2015, Plaintiff requested from Defendant White an additional copy of the affiliation agreement. Id. at ¶ 32. Plaintiff was able to obtain a second copy of the agreement from SUNY-Potsdam on July 20, 2015. Id. at ¶ 34. Plaintiff's internship resumed after he dropped the agreement off with the Chief Executive Officer of the Medical Center. Id. at ¶ 35.

On July 21, 2015, Plaintiff was called to the Human Resources Office at the Medical Center to be questioned about the affiliation agreement. Id. at ¶ 37. Plaintiff raised the issue of why Conley and SUNY-Potsdam had not contacted the Medical Center throughout the internship. Id. The Medical Center, Plaintiff alleges, "was unaware that the internship had started due to" SUNY-Potsdam, Conley, and White's failure to contact the Center. Id. at ¶ 38. The internship resumed that day, but only in the Emergency Department and only under Sciorra's observation. Id. at ¶ 39.

The Medical Center dismissed Plaintiff from the internship site, via e-mail, on July 29, 2015. Id. at ¶ 41. Plaintiff alleges that his dismissal was a result of "neglect and failure to abide by the State University of New York polices and procedures" by Defendants Conley and White. Id. at ¶ 42. The Medical Center contended that Plaintiff "did not abide by required policies and procedures among [them] not having respect for authority." Id. at ¶ 43. The Medical Center stated that Plaintiff had "disregarded hospital protocols and procedures," but did not offer an explanation of that conduct. Id. at ¶ 45.

That same day, Defendant White, the internship coordinator, e-mailed Plaintiff to

demand that he call and arrange a formal meeting as soon as possible. Id. at ¶ 46. Plaintiff called White, and on August 6, 2015, Plaintiff attended a meeting that included White, Conley, and Plaintiff's mother. Id. at ¶ 48. Plaintiff alleges that White "harassed and questioned" him, claiming that Plaintiff was terminated from the internship because he failed to sign a paper. Id. at ¶ 49. Plaintiff contends that he was not required to sign that paper, which "was for volunteers and not interns." Id. White ignored this fact. Id. at ¶ 50. White also failed to acknowledge that Plaintif had kept his hours as required by the internship rules. Id. at ¶ 51.

Plaintiff turned in a journal longer than twenty pages about his internship experience on August 6, 2015. Id. at ¶ 53. The journal not only summarized his experience, but also contained "educationally sourced research material of observed illnesses." Id. Defendant Conley advised Plaintiff that this submission did not meet expectations and did not "suffice for a grade." Id. at 54. On August 13, Conley and Plaintiff "[came] to terms for a topic to write a second research aspect for the internship." Id. at ¶ 55. Plaintiff "expressed his distress with the breaking of the legal document 'Learning Agreement Form,'" but Defendant Conley "disregarded these expressions." Id. at ¶ 56. Conley also e-mailed Plaintiff to inform him that he had been terminated from the Medical Center for reasons unrelated to Plaintiff's academic status. Id. at ¶ 57. He also advised Plaintiff "that he was on sabbatical leave for the Fall of 2015 semester and could not do anything academic." Id. at ¶ 58.

Plaintiff alleges that on August 19, 2015, Conley altered the terms of the internship, requiring increased "quantity and quality of required assignments[.]" Id. at ¶ 60. Plaintiff now had to produce a 25-page research paper containing two primary sources per page,

as well as an additional oral presentation.  Id. at ¶ 61.  Plaintiff was also limited to five

academic credits for the course.  Id.  Plaintiff contends that these changes violated the

Internship learning Agreement Form.  Id. at ¶ 62.  The paper Plaintiff turned in on

December 15, 2015 had 23 pages of text, eleven pages of sources, and nine pages of

figures.  Id. at ¶ 65.  The paper's length far exceeded the minimum research paper

requirements at SUNY-Potsdam.  Id. at ¶ 66.  Plaintiff contends that the requirements for

this project also exceeded those of a normal internship at SUNY-Potsdam.  Id. at ¶ 67-68.

Despite this extra work, Plaintiff received a grade of "S" for his internship, and not the

"agreed upon numerical grade of 4.0 for completing each requirement."  Id. at ¶ 69.

Plaintiff appealed this grade to Defendant Steven J. Marqusee.  Id. at ¶ 72.  Plaintiff

alleges that Marqusee failed to change his grade from an "S," despite the fact that Plaintiff

had completed all of the requirements and thus was entitled by "the legally binding

Learning Agreement Form" to "receive his 4.0 for his completed requirements."  Id. at ¶

73.

Plaintiff appealed this decision to Defendant Alan L. Hersker on June 20, 2016.  Id.

at ¶ 75.  On that date, Plaintiff had a meeting with Defendant Hasker that lasted

approximately 50 minutes.  Id. at ¶ 76.  Hasker asked Plaintiff to submit additional

materials to prove his claims against staff at SUNY-Potsdam.  Id. at ¶ 77.  Plaintiff

provided those materials.  Id. at ¶ 78.  In a decision issued on June 30, 2016, Defendant

Hasker refused to change the grade.  Id. at ¶ 79.  Plaintiff continued his efforts to resolve

the matter; he had meetings with ten college officials about the issue.  Id. at ¶ 80.  None

would address the matter "appropriately."  Id.

Plaintiff's Complaint contains five causes of action.  The first alleges a breach of

contract against SUNY-Potsdam, Conley, and White.  The second attempts to raise a

claim for breach of fiduciary duty against all Defendants.  The third claim is labeled as

"emotional distress against all defendants"; Plaintiff does not state clearly whether the

claim is for negligent or intentional infliction of emotional distress.  The fourth claim is

stated as "potential loss of opportunities/loss of chance."  No Defendants are named

specifically on this claim.  The fifth cause of action, raised against SUNY-Potsdam and

Walter Conley, alleges a violation of Section 504 of the Rehabilitation Act of 1973.

Defendants' motion seeks to dismiss all claims except the Rehabilitation Act claim.

## II.    LEGAL STANDARD

Defendants seek to dismiss Plaintiff's claims pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.[1]  "The test for evaluating a 12(c) motion is the same as that

applicable to a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6)."  Irish Lesibian & Gay

Org. v. Giuliani, 143 F.3d 638, 644 (2d Cir. 1998).  Under that standard, the Court must

accept "all factual allegations in the complaint as true, and draw[] all reasonable

---

[1]Plaintiff requests that the Court deny Defendants' motion as untimely. He notes that they have answered the Complaint, that the parties have engaged in discovery, and that a motion to dismiss normally must be brought within 21 days of service of the Complaint.  See Fed. R. Civ. P. 12(a)(1)(A)(i).  Plaintiff is surely correct that this motion, filed almost a year after the Plaintiff filed his Complaint, could be dismissed as untimely if filed as a Rule 12(b)(6) motion to dismiss.  Defendants do not file a 12(b) motion, however.  Instead, they file a 12(c) motion, which may be filed "[a]fter the pleadings are closed–but early enough not to delay trial[.]" Fed. R. Civ. P. 12(c).  While the Court agrees that the Defendants wasted considerable time in filing their motion, especially since all the arguments that they now make were available on the face of the Complaint.  Failing to file a 12(b)(6) motion earlier was surely dilatory and led to unnecessary work for the parties and court officers addressing motions that grew out of the discovery process. Still, Plaintiff's motion for judgment on the pleadings came before discovery has closed and will not delay the trial, and the Court will consider the motion.  At the same time, the Court urges the Defendants in the future to file motions which could limit the issues before the Court as soon as possible.

inferences in the plaintiff's favor." Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009). This tenet does not apply to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)). When, as here, the Plaintiff proceeds *pro se*, the Court "'construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.'" Weixel v. Bd. of Educ. of N.Y., 287 F.3d 138, 146 (2d Cir. 2002) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000)). "This is especially true when dealing with pro se complaints alleging civil rights violations." Id.

## III.    ANALYSIS

Defendants offer several grounds for dismissing all counts in the Complaint except the Rehabilitation Act claim. The Court will address each in turn.

### A.    Sovereign Immunity

Defendants first contend that the first four causes of action against SUNY-Potsdam must be dismissed because SUNY-Potsdam, as a subdivision of the State of New York, enjoys sovereign immunity from such contract and tort claims. Likewise, to the extent that any of the individual defendants are sued in their official capacities, they are also immune from suit. Plaintiff responds that, by removing the case to this Court, Defendants waived state immunity.

"The Court has held that, absent waiver by the State or valid congressional

8

override, the Eleventh Amendment bars a damages action against a State in federal court." Kentucky v. Graham, 473 U.S. 159, 169 (1985). The Eleventh Amendment provides "immunity of a state's treasury from claims for damages brought by private entities in federal courts." Beaulieu v. Vermont, 807 F.3d 478, 483 (2d Cir. 2015). Such "immunity protects a state's dignity and fiscal integrity from federal court judgments, and acts as a limitation on the federal judiciary's Article III powers." Id. (internal citations omitted). States also have a broader sovereign immunity that operates outside of the Eleventh Amendment. This immunity "applies against *all* private suits, whether in state or federal court." Id. (emphasis in original). State immunity is not absolute. A state can "elect to waive either type of immunity either in federal or state court," and Congress, in some circumstances, "may override state sovereign immunity by exercising its Fourteenth Amendment enforcement powers." Id.

Plaintiff does not deny that SUNY Potsdam and the individual defendants in their official capacities could normally claim immunity from money damages for the tort and contracts claims in this case. He could not. "SUNY 'is an integral part of the government of the State [of New York] and when it is sued the State is the real party.'" Dube v. State University of New York, 900 F.2d 587, 595 (2d Cir. 1990) (quoting State University of New York v. Syracuse Univ., 285 A.D. 59, 61, 135 N.Y.S.2d 539, 542 (3d Dept. 1954)). Likewise, "[t]he eleventh amendment bars recovery against an employee" of the State "who is sued in his official capacity[.]" Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988). To the extent that Plaintiff's claims are against the individual Defendants in their official capacities, then, the Court's ruling on immunity will apply to those claims as well.

Plaintiff's claim here, however, is that SUNY-Potsdam waived any immunity by

removing the case to federal court. Plaintiff cites to <u>Lapides v. Board of Regents of the University System of Georgia</u>, 535 U.S. 613 (2002) for this proposition. <u>Lapides</u> found that a state that had waived sovereign immunity to permit money damages in state court could not remove the case to federal court and then rely on the Eleventh Amendment to claim immunity from damages in federal court. 535 U.S. at 623-24. The Second Circuit has explained the Supreme Court's reasoning, finding that "it would be unfair to allow a state which is liable in its own courts to remove a suit from its own courts to federal court and thereby escape all liability on the ground that the federal court lacks power to impose liability on the state." <u>Beaulieu</u>, 807 F.3d at 486. A state should not be able to "recover" immunity the state waived by removing the case to federal court. <u>Id.</u> at 487. The Second Circuit addressed a different question in <u>Beaulieu</u>, however: whether when "a state defendant has not waived its underlying sovereign immunity, i.e., where it is arguably protected from private suit in its own courts as well as in federal fora," may "the state . . . avail itself of removal to the federal court without sacrificing this immunity, notwithstanding that by removing it gives up entitlement to Eleventh Amendment immunity from suit in a federal forum"? <u>Id.</u> at 488. The Second Circuit found that such a removal did not waive the State's sovereign immunity. <u>Id.</u> 490.

New York law establishes that "[t]he state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations, provided the claimant complies with the limitations of this article." NY Ct. C. Act § 8. The Court of Claims Act "confers jurisdiction on the court [of claims] to hear and determine 'almost every conceivable kind of action against the

State[.]'" <u>Brown v. State</u>, 89 N.Y.2d 172, 180 (1996) (quoting Breuer, THE NEW YORK STATE COURT OF CLAIMS: ITS HISTORY, JURISDICTION AND REPORTS, at 23).  Defendants contend that this jurisdiction encompasses all of the claims except the federal claim in this case, and thus the only court that is permitted to hear Plaintiff's claims is the Court of Claims.

Defendants are surely correct that the New York Court of claims, not this Court is the Court authorized by statute to hear the claims for which the State has waived its sovereign immunity.  Courts have recognized that New York law "makes the Court of Claims the only judicial body capable of taking congnizance of" actions against the State. <u>McNeil v. United States Dep't of Housing & Urban Dev.</u>, 293 F.Supp. 300, 301 (S.D.N.Y. 1968).  The Court would dismiss such claims if Plaintiff had attempted to bring them in this Court.  <u>See</u> <u>Tigner v. New York, Comm'r of Dep't of Corrections</u>, 559 F.Supp. 25, 27 (W.D.N.Y. 1983) (dismissing due process claim regarding confiscation of property brought in federal court because Court of Claims "provided [plaintiff] 'the means by which he can receive redress for that deprivation.'") (quoting <u>Parratt v. Taylor</u>, 451 U.S. 527, 543 (1981)).

Noting that neither party has identified a case that addresses directly the issue here–whether the State may invoke immunity after removing to this Court a case that could only be heard in the New York Court of Claims, the Court finds that Eleventh Amendment immunity should still apply.  The Court notes that New York's waiver of immunity, while broad, was very specific as to the Court in which the waiver would apply. New York waived immunity on the claims here at issue, but only on the condition that those claims be heard in the Court of Claims.  The claims could not have been brought in

11

the State Supreme Court either.  This Court is not the Court of Claims.  That is the venue

made available under New York law for such claims against the State.  Dismissing

Plaintiff's claims against the State of New York without prejudice to refiling in that venue

does not amount to permitting the State to use the Eleventh Amendment to avoid claims

for which the State has wavied sovereign immunity.  The concerns expressed in Lapides

are not implicated under those circumstances.  The motion will be granted in that respect.

### B.    Breach of Contract

While immunity prevents suits against SUNY-Potsdam and the individual

Defendants in their official capacities, that immunity "does not protect" an individual

defendant "from personal liability if he is sued in his 'individual' or 'personal' capacity."

Farid, 850 F.2d at 921 (quoting Kentucky v. Graham, 473 U.S. 159, 166-67 (1985)).  The

Court will therefore address the claims against the individual defendants on the merits and

in the interest of completeness address against SUNY-Potsdam as well.

Plaintiff attempts to raise a contract claim against Defendants Conley, White, and

the SUNY-Potsdam.  Plaintiff alleges that the Learning Agreement form represents a

contract.  Complt. at ¶ 83.  Defendants, he claims, breached their obligations by "failing to

advocate, overlook, and grade Plaintiff[.]"  Id. at ¶ 84.  They also breached the contract by

failing to award Plaintiff a 4.0 grade.  Id. at ¶ 85.  Plaintiff also contends that the

Defendants' conduct breached an implied covenant of good faith and fair dealing.  Id. at ¶

89.

In New York, "[t]he essential elements of a cause of action to recover damages for

breach of contract are the existence of a contract, the plaintiff's performance pursuant to

the contract, the defendant's breach of its contractual obligations, and damages resulting

from the breach." PFM Packaging Mach. Corp. v. ZMY Food Packing, Inc., 16 N.Y.S. 3d

298, 2015 N.Y. App. Div. LEXIS 6711 at *2 (2d Dept. Sept. 16, 2015).

Defendants argue that none of the individual Defendants are a party to the alleged

contract, and Plaintiff has therefore failed to allege even the first element of a contract

claim. Defendants insist that SUNY-Potsdam is the real party of interest in the alleged

contract.

Plaintiff's Complaint alleges that:

83. The Learning Agreement Form attached hereto as **Exhibit B** and incorporated
herein by reference is a binding legal instrument that creates mandatory obligations
on the part of the Defendants noted above.
84. The above stated Defendants breached their contractual obligations to Plaintiff,
Carrow, by failing to advocate, overlook, and grade Plaintiff, Carrow. This is noted
in **Exhibit B**, the failures presented in **Exhibit C-Exhibit H**.
85. The above stated Defendants breached their contractual obligations to Plaintiff,
Carrow, by failing to award him his 4.0 numerical grade by their agreed upon
stipulations.
86. The Breach of Contract occurred on August 6, 2015, as a result of Defendant
Walter J. Conley, neglecting and failing to own up to his actions. His direct actions
of neglect warranted Plaintiff, Carrow, to be terminated from his internship, his need
to complete additional work based on arbitrary and capricious standards.
87. Defendant, Walter J. Conley, and Defendant Toby J. White, directly caused the
State University of New York at Potsdam to have to attempt to hide and dismiss the
breach of contract actions and reviews called by Plaintiff, Carrow.

Plaintiff also alleges that he performed all of his obligations under the contract, and that

Defendants violated the implied covenant of good faith and fair dealing in that contract. Id.

at ¶¶ 88-89 (emphases in original). He seeks "in excess of" $1 million for the breach.

Plaintiff attaches the document he claims is a contract to his Complaint. See

Internship Learning Agreement, Exh. B. to Complt., dkt. # 1-1. The document is entitled

"Internship Learning Agreement Form." Id. The form lists Plaintiff as the student. Id. The

internship covers the Summer 2015 term. Id. The form lists the internship site as Claxton

Hepburn Medical Center Emergency Department. Id. Julie Sciorra, the ER Director, is to serve as site supervisor. Id. The document provides that "[a]ll students must submit an Internship Proposal in order to be registred for internship credit." Id. Failure to file the proposal could "delay registration for credit." Id. Different credit hours are available based on the number of hours a student works during the internship. Id. A student could earn anywhere for 1 to 12 credits. Id. The form also contains "academic information." Defendant Walter Conley is listed as the "Faculty Sponsor." Id. Plaintiff aimed to earn 9 credit hours, a total of 360 hours in addition to the required academic component. Id. The form lists the grading system of as "number grade" rather than S/U. Id. The form also lists five learning objectives for the internship, including gaining knowledge of diseases and pathogens, as well as medical practice in an emergency department. Id. The form requires a "mandatory paper/project," which for Plaintiff consisted of a twenty-page research paper focusing on the "etiology of diseases observed" and the "evolutionary biology of pathogens." Id. Plaintiff also apparently agreed to provide an "oral presentation of the experience." Id. The forum contains a space for signatures. Id. Plaintiff, Sciorra, Defendant Conley, the SUNY-Potsdam department chair, and Plaintiff's SUNY-Potsdam academic advisor signed the form. Id. Defendant Conley did so in his capacity as Plaintiff's Faculty Sponsor. Id. The form makes clear that "[a]ll students seeking to secure internship credit must complete this Learning Agreement Form and secure signatures above prior to the following deadlines to ensure proper and timely registration." Id.

As proof that this document constitutes a contract that Defendants have breached, Plaintiff points to portions of information about internships provided by SUNY-Potsdam that are included in the Complaint. See Exh. C to Complaint, dkt. # 1-1. In relevant part,

14

that document provides that "A Learning Agreement serves several purposes: It outlines what you intend to learn and accomplish during your internship.  It acts as a legal binding contract between you, your internship site supervisor and the College.  It details mutual intentions and expectations."  Id.  Plaintiff also cites to other documents he claims provide the terms of the contract.  He points to the student code of conduct and the Faculty Senate Internship Policy.  See Exhs. D and E to Complaint, dkt. # 1-1.  He also points to portions of the Faculty Senate Internship Policy which address faculty conduct such as faculty communication with student interns, contact and communication with the site supervisor, advising of student interns, and academic evaluation and assessment.  See Exh. F to Plaintiff's Complaint, dkt. # 1-1.  Plaintiff also includes a template used by interns to report their hours worked.  See Exh. G to Complaint, dkt. # 1-1.

Here, the Plaintiff attempts to meld together portions of a variety of documents and declare that they represented the terms of a contract between him and Defendants.  He relies largely on a statement contained in materials provided to students that declares that the Learning Agreement is a binding contract between Plaintiff, his supervisor at the internship site, and the "College."  If Plaintiff intends to rely on this statement, then the only parties to the contract named in the lawsuit are Plaintiff and SUNY-Postdam.  That statement says nothing about the academic supervisor of the internship.  Conley signed the learning agreement, but Toby White, also a defendant on the contract claim, is nowhere named in these documents.  Thus, the document that Plaintiff sites as evidence of the contract make clear that only SUNY-Potsdam could have contracted with Plaintiff.  Since SUNY-Potsdam is immune from suit in this Court, Plaintiff has not raised a contract claim against any party to a contract who allegedly breached the agreement.  The motion

will be granted in that respect.

Defendants argue that SUNY-Potsdam–which is immune–is the real party in interest on the contract, and the individual Defendants therefore cannot be liable.  Courts in New York are clear that "[c]laims for damages against State agencies, officers, and departments in their official capacity, where the matter is, in reality, one against the State, i.e., where the State is the real party in interest, can be prosecuted only in the Court of Claims."  Starker v. Trump Vil. Section 4, Inc., 104 A.D.3d 937, 937-38 (2d Dept. 2013).  "Generally, '[t]he Court of Claims has exclusive jurisdiction over actions for money damages against State agencies, departments, and employees acting in their official capacity in the exercise of governmental functions.'" Borawaski v. Abulafia, 117 A.D.3d 662, 663 (2d Dept. 2014) (quoting Dinnerman v. NYS Lottery, 58 AD3d 669, 669, 870 NYS2d 792 (2009)).  If "'the suit against the State agent or officer is in tort for damages arises from the breach of a duty owed individually by such agent or officer directly to the injured party, the State is not the real party in interest–even though it could be held secondarily liable for the tortious acts under respondeat superior.'" Id. (quoting Morell v. Balasubramanian, 70 NY2d 297, 301, 514 NE2d 1101 (1987)).  Here, Plaintiff pleads a contract claim alleging a breach of a contractual obligation and not a tort claim alleging individual liability against a defendant who allegedly breached a duty the defendant personally owed Plaintiff.  The State is the real party in interest, and the contract claim can be dismissed on that basis as well.

In any case, the Plaintiff's allegations, even if the Court were to assume that Conley and White were parties to the contract and that SUNY-Potsdam could be liable on a contract claim, do not amount to a claim that either individual Defendant breached the

16

agreement.  "'In determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look . . . to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'" Minelli Constr. Co., Inc. v. Volmar Constr., 917 N.Y.S.2d 687, 688, 82 A.D. 3d 720, 721 (2d Dept. 2011) (quoting Brown Bros. Elec. Contrs. v. Beam Constr. Corp., 41 N.Y.2d 397, 399, 361 N.E..2d 999 (1977)).  "'Generally, courts look to the basic elements of the offer and acceptance to determine whether there is an objective meeting of the minds.'" Id. (quoting Matter of Express Indus. & Term. Corp. v. New York State Dept. of Transp., 93 NY2d 584, 589, 715 N.E.2d 1040 (1999)).

Assuming that the learning agreement is a contract, White is nowhere named as a party to that contract, and cannot be liable.  As to Conley, even giving the agreement the most generous reading possible, nothing in that document requires Conley to perform the acts that Plaintiff's Complaint claims constitute a breach.  To some extent, Plaintiff contends that Conley breached the agreement by failing to give Plaintiff a 4.0 grade for the course.  Nowhere in the agreement outlined above was Conley required to give Plaintiff a 4.0 grade.  Failing to do so cannot constitute a breach of the agreement. Similarly, Plaintiff's allegations, outlined above, that Conley's teaching did not meet Plaintiff's expectations in terms of how he graded exams and structured assignments, does not make out a breach-of-contract claim.  This is especially true because Plaintiff admits in his allegations that he was fired from his internship site before Conley ever attempted to assign him a grade, changing the circumstances under which he could be graded.  While Plaintiff cites to teaching standards articulated by SUNY-Potsdam and the Faculty Senate, those expectations were not part of the contract and failing to abide by them does not

constitute a breach.  Allegations that Conley was a bad teacher does not amount to a claim that Conley violated the alleged contract.

Plaintiff also claims that Defendants violated an implied covenant of good faith and fair dealing contained in the contract.  "New York law implies a covenant of good faith and fair dealing 'pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Mendez v. Bank of Am. Home Loans Servicing, LP, 850 F.Supp.2d 639, 652 (E.D.N.Y. 2012) (quoting Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407 (2d Cir. 2006)).  "The covenant 'can only impose an obligation consistent with other mutually agreed upon terms in the contract.  It does not add to the contract a substantive provision not included by the parties.'"  Id. (quoting Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005)).

Plaintiff offers a conclusory allegation that Defendants' conduct constituted a breach of that covenant, and references conduct described previously in the Complaint. The Court, making all inferences in Plaintiff's favor, concludes that such conduct is the conduct that Plaintiff contends deprived him of the grade he deserved from the internship. Plaintiff, as explained, alleges that Defendant Conley arbitrarily changed the standards for the assigned paper, and that he failed to follow the University's procedures–contained not in the alleged contract but in other documentation–for professors who supervised internships.  Plaintiff implies that these failings led to his termination from the internship and led also to him not receiving the grade he expected.  The problem with Plaintiff's argument is that he seeks to add obligations to the contract that rise out of other written documents produced by SUNY-Potsdam and unrelated to the terms stated in the contract.

18

He asserts the breach of an implied covenant based on these outside terms, and the implied covenant "'can only impose an obligation consistent with other mutually agreed upon terms in the contract.'" Broder, 418 F.3d at 198 (quoting Geren v. Quantum Chem. Corp., 832 F.Supp. 728, 732 (S.D.N.Y. 1993) (internal quotations omitted)). Plaintiff seeks to add obligations not stated in the contract. Those obligations might be used by Conley's academic department to hold him accountable for poor performance in teaching, but they cannot be used to add obligations to an agreement designed simply to govern a relationship between a school, a student, and an external internship site.

For those reasons, the Court will grant the motion to dismiss the contract claim in the Complaint. As the documents Plaintiff supplies demonstrate conclusively that repleading the claim would be futile, the motion will be granted with prejudice with respect to this claim.

### C.    Breach of Fiduciary Duty

Defendants next seek dismissal of Plaintiff's breach of fiduciary duty claim against them. Plaintiff raises that claim against all Defendants. The Complaint alleges that:

> 92. Plaintiff, Carrow, entered a fiduciary relationship with Defendant, the State University of New York at Potsdam. This fiduciary relationship incorporates all the implied relationships that the staff and Defendants' [sic] of this institution were designed to uphold.
> 93. Defendant, the State University of New York at Potsdam breached their fiduciary duty by not upholding their own policies and procedures. This institution failed to put forth a competent subject that knew and was willing to uphold their policies and procedures. Above their own policies and procedures, the State University of New York at Potsdam failed to uphold the State University of New York University Faculty Senate Policies on Internships and Co-ops. This was a clear and evident Breach of Fiduciary Duty of an institution.
> 94. Defendant, Walter J. Conley, breached his fiduciary duty, by not upholding the policies of the State University of New York at Potsdam, and the State of New York University Faculty Senate Polices on Internship and Co-op. Defendant, Walter J. Conley, knowingly did not follow up with the internship site, did not submit a

syllabus, provided no official grades, did not visit the internship site.  Defendant, Walter J. Conley, acted in complete disregard for any policy implement.

95.  Defendant, Toby J. White, breached his fiduciary duty, by no over-seeing the entirety of Plaintiff, Carrow['s] internship.  Defendant Toby J. White, knowingly did not submit the Mid-term and Final-Evaluation Forms at the commencement of the internship.  Defendant, Toby J. White, knowingly revised/took-part in the deletion of this allegation from State University of New York at Potsdam Internship Guideline's [sic].

96.  Defendant, Steven J. Marqusee, breached his fiduciary duty, when he decided to not give a fair and accurate official grade appeal in conjunction with the State University of new York at Potsdam, and the State University of New York University Faculty Senate Policies.  Defendant, Marqusee, knowingly acknowledged the wrong-doings of the Defendants' [sic] but failed to give a legal remedy to the grade appeal.

97.  Defendant, Alan L. Hersker, breached his fiduciary duty, when he decided to not give a fair and accurate appeal of Defendant, Marqusee['s] decision.  Defendant, Alan L. Hesker failed to uphold the State University of New York at Potsdam, and the State University of New York University Faculty Senate Polices on Internships.  Defendant, Hersker, knowingly acknowledged the wrongful acts in [a] personal meeting, but evidently failed to take action in his appeal fo decision.

Complt. at ¶¶ 93-97.  Plaintiff seeks more than $1 million in damages for this alleged breach.

In New York, "the elements of a cause of action for participation in a breach of fidcuiary duty are: breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages."  SCS Commns., Inc. v. Herrick Co., 360 F.3d 329, 342 92d Cir. 2004).

Defendants argue that Plaintiff has not alleged the existence of a fiduciary relationship with any of the individual Defendants who could be liable on this claim.  In New York, "[a] fiduciary relationship exists . . . 'when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'"  Flickinger v. Harold c. Brown & Co., 947 F.2d 595, 599 (2d Cir. 1991) (quoting Madelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 168, 521 N.Y.S.2d 672, 676 (1987)).  "Broadly

stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." Penato v. George, 52 A.D.2d 939, 942 (2d Dept. 1976).  "The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another." Id.  A fiduciary relationship can exist, "in appropriate circumstances, between close friends or even where confidence is based upon prior business dealings." Id.  "'A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" Marmelsten v. Kehillat New Hempstead: Rav Aron Jofen Community Synagogue, 45 A.D.3d 33, 36 (1st Dept. 2007) (quoting RESTATEMENT [SECOND] OF TORTS § 874, Comment a) (finding no fiduciary relationship where "the defendant held himself out as a counselor and adviser with an expertise in women's issues" because these were "merely general allegations" and "the mere giving of advice that is in turn accepted is not sufficient to create a fiduciary relationship.").

The Court agrees with the Defendants that Plaintiff has not adequately alleged a fiduciary relationship with any of the Defendants.[2]  He alleges that he entered into a fiduciary relationship with SUNY-Potsdam, but the allegation is merely conclusory and is

---

[2]Plaintiff's citation to Sylvester v. Texas S. Univ., 957 F.Sup. 944 (S.D. Tx. 1997) is unavailing.  In Sylvester, a law student complained about the process that her school used when she appealed a grade.  Id. at 945.  Texas Southern had procedures in place to handle grade disputes, but did not follow them.  Id. at 946.  The court found that the student "had a right to both procedural and substantive due process in contesting her grade; she received neither." Id. at 947.  The University had set up a procedure for contesting grades, and the University violated the plaintiff's due process rights by ignoring that procedure.  Id.  The Court concluded that the plaintiff should receive a "pass" grade for her class, a conclusion that allowed plaintiff to obtain standing as co-valedictorian of her class.  Id.  Plaintiff has not raised any sort of a due process claim here.

immaterial anyway–the Court has determined that SUNY-Potsdam is immune in this

matter.  As to the individual Defendants, Plaintiff has not alleged any sort of particular

relationship.  He alleges instead that the fiduciary relationship he allegedly entered into

with SUNY-Potsdam "incorporate[d] all the implied relationships that the staff and

Defendants' [sic] of this institution were designed to uphold."  Comptl. at ¶ 92.  Such an

allegation does not describe any particular relationship where a Defendant undertook any

sort of particular duty or promise to Plaintiff, but instead describes a general relationship

between a student and a teacher or an academic administrator and a student.  See, e.g.,

Marmelsten, 45 A.D.3d at 36.  Moreover, the breach of duty described does not point to

any particular relationship or promises made by the alleged fiduciary to the Plaintiff, but

instead describes the general obligations of the Defendants' job.  Such allegations do not

describe a breach of a fiduciary duty, but instead a failure to live up to the general

expectations of teachers and administrators.  The motion will be granted in this respect as

well.

### D.  Emotional Distress

Defendants next seek dismissal of Plaintiff's claims for intentional infliction of

emotional distress against the individual Defendants, arguing that Plaintiff has not alleged

the extreme and outrageous conduct necessary to make out such a claim.  Plaintiff agrees

that the standard requires extreme and outrageous conduct, though he refers to the tort in

question as "negligent infliction of emotional distress."

Whether Plaintiff attempted to plead intentional or negligent infliction of emotion

distress, he was required to plead a certain state of mind.  "[A] cause of action for either

intentional or negligent infliction of emotional distress must be supported by allegations of

conduct by the defendants 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" <u>Sheila C. v. Povich</u>, 11 A.D.3d 120, 130-131 (1st Dept. 2004) (quoting <u>Murphy v. American Home Prods. Corp.</u>, 58 N.Y.2d 293, 303, 448 N.E.2d 86 (1983)).

Plaintiff's Complaint alleges that Defendants knew "or should have known that unless they intervened to protect Plaintiff and properly to supervise, prohibit, control, and /or regulate the conduct of the other Defendants, those Defendants" would assume that their conduct was approved.  Complt. at ¶ 101.  Though Defendants had the means "to stop engaging in" the offensive conduct, and to prevent others from engaging in that conduct, they did so without regard to how Plaintiff would be injured.  <u>Id.</u> at ¶¶ 102-103.  In support of his claim that Defendants acted in an extreme and outrageous fashion, Plaintiff contends that they "imposed malicious, arbitrary, and capricious standards" on his internship.  Plaintiff's Brief, dkt. # 46, at 12.  They "had no regard for the Plaintiff's future in the medical field and references he obtained during and prior to his internship[.]"  <u>Id.</u> at 12-13.  Defendants allegedly ignored his status as an honor student.  <u>Id.</u>

The Court finds that Plaintiff has not alleged extreme and outrageous conduct sufficient to state a claim.  His Complaint does not allege that Defendants engaged in conduct beyond the bounds of human decency or so atrocious as to be seen as utterly intolerable in a civilized society.  Making all inferences in Plaintiff's favor, Plaintiff simply alleges that Defendants failed to follow procedures established by the school for supervising internships and assigning and reviewing grades.  Such complaints are not unusual in the higher education setting; even accepted as true, those allegations are not

so beyond the bounds of human decency that the Court would consider them evidence sufficient to establish either intentional or negligent infliction of emotional distress.  Cases addressing this tort have found no outrageous conduct in settings both analogous and more outrageous than that alleged here.  See, e.g., Murphy, 58 N.Y.2d at 298, 303 (no extreme and outrageous conduct where defendants allegedly fired because he reported accounting improprieties and because of his age); Sheila C., 11 A.D.3d at 131 (minor "plaintiff's allegations that defendants suggested she act provocatively, and allowed her to be introduced to a purported rapist, with whom she had a later, voluntary meeting, well after she was no longer in the physical custody of the defendants, simply do not rise to the level of conduct necessary to sustain" a cause of action for negligent or intentional infliction of emotional distress).

Because Plaintiff has not alleged extreme and outrageous conduct by any Defendant, the Court will grant the motion in this respect as well.

### E.  Loss of Opportunity/Loss of Chance

Plaintiff's fourth cause of action is entitled "Potential Loss of Opportunity/Loss of Chance."  See Complt. at ¶¶ 105-109.  Plaintiff alleges that he "has future goals of attending graduate school for his Doctorate in Osteopathic Medicine."  Id. at ¶ 107.  Due to Defendants' conduct, he claims, he "has faced major setbacks in regards to his Grade-Point Average, Professional References, and Patient Care Hours."  Id.

Defendants contend that these allegations fail to state a claim.  They point to Connaughton v. Chipotle Mexican Grill, Inc., 29 N.Y.3d 137 (2017), for the proposition that damages for lost opportunity do not constitute a cause of action.  Plaintiff responds by pointing to cases that hold that damages in fraud cases are available for lost opportunities

24

and profits if such damages can be proven by more than speculation.  See Rather v. CBS Corp., 886 N.Y.S.2d 121, 127 (1st Dept. 2009) (to plead pecuniary loss in fraud, a plaintiff must allege "that he had something of value, was defrauded by [defendant] into relinquishing it for something of lesser value, and that the difference between the two constituted [plaintiff's] pecuniary loss" and losing an "'alternative contractual bargain . . . cannot serve as basis for fraud or misrepresentation damages because the loss of the bargain was 'undeterminable and speculative.'"") (quoting Lama Hold Co. v. Smith Barney, 88 NY2d 413, 422 (1996)); Manas v. VMS Assocs., LLC, 863 N.Y.S.2d 4, 7 (1st Dep. 2008) (damages for fraud-in-the-inducement "are meant to 'indemni[f]y for the loss suffered through that inducement', e.g., damages for foregone opportunities.") (quoting Brushton-Moira Cent. School Dist. v. Thomas Assoc., 91 NY2d 256, 261 (1998)); In re MarketXT Holdings Corp., No. 04-12078, 2006 WL 2864963 at *21 (Bankr. S.D.N.Y. Sept. 29, 2006) (cannot obtain fraud or misrepresentation damages based on a lost "alternative contractual bargain" if the "existence of the alternative contractual bargain is undeterminable and speculative.").

The Court will grant the motion in this respect as well.  First, the damages that Plaintiff alleges are speculative and undeterminable.  He contends that as a result of Defendants' conduct his chance of graduate school in osteopathic medicine has been undermined.  He does not claim that he had been accepted to any school and had that acceptance withdrawn because of Defendants' conduct.  He also does not point to any pecuniary value in a lower grade-point average or loss of references.  Plaintiff has therefore not alleged any compensable damages in his "loss of opportunity/loss of chance claim."

More fundamental, however, is the fact that Plaintiff has merely pled a form of damages. The cases cited by both parties in reference to this claim are cases that address whether a plaintiff stated a claim for fraud. Since fraud in New York "is defined as a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to introduce the part to act upon it, and which causes injury," failing to allege injury means that Plaintiff has failed to allege fraud. Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104 (2d Cir. 2001)). Plaintiff alleges a potential element of damages in fraud as a free-standing claim. Such a claim cannot exist. Since he has also failed to allege damages for fraud, the Court could not read his claim as a plausible–if poorly pleaded–claim of fraud. The Court will therefore grant the motion in this respect as well.

## IV.    CONCLUSION

For the reasons stated above, the Court will GRANT the Defendants' motion to dismiss the Complaint. See dkt. # 39. Counts 1-4 of the Complaint are dismissed as to all parties. Count Five of the Complaint remains before the Court.


**IT IS SO ORDERED.**

Dated:   March 22, 2018

Thomas J. McAvoy
Senior, U.S. District Judge

26